UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Minnesota Mining and
Manufacturing Company, and
Riker Laboratories, Inc.,

Plaintiffs,

v.

MEMORANDUM OPINION
AND ORDER
Civil No. 00-2022(MJD/FLN)

Barr Laboratories, Inc.,

Defendant.

---

Alphapharm Pty. Ltd.,

Plaintiff-Intervenor,

v.

Barr Laboratories, Inc.,

Defendant.

---

Matthew J. Goggin and Jeffer Ali, Merchant & Gould, Allen M. Sokal, Charles E. Lipsey and David S. Forman, Finnegan, Henderson, Farabow, Barrett & Dunner, L.L.P. for and on behalf of Plaintiffs 3M and Riker Laboratories, Inc.

James F. Hurst, Christine J. Siwik and Christopher Shearer, Winston & Strawn and Samuel L. Fox and Donald R. McPhail, Sterne, Kessler, Golstein & Fox, P.L.L.C. and Douglas B. Greenswag, Leonard, Street and Deinard, for and on behalf of Defendant Barr Laboratories, Inc.

Bruce H. Little, Garrett M. Weber, Lindquist & Vennum, P.L.L.P. and Edgar H. Haug, James K. Stronski and John G. Taylor, Frommer Lawrence & Haug LLP for and on behalf of Plaintiff-Intervenor Alphapharm Pty. Ltd.

---

APR 18 2001
FILED
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Plaintiffs Minnesota Mining and Manufacturing Company and Riker Laboratories, Inc. (collectively "3M") make and sell an antiarryhthmic drug called TAMBOCOR™. The active ingredient in TAMBOCOR™ is a chemical called flecainide acetate. United States Patent No. 4,650,873 ('873 patent) claims a method of manufacturing the active ingredient and United States Patent No. 4,642,384 ('384 patent) claims intermediate compounds present in flecainide acetate manufactured using the '873 patent method. As will be discussed in detail below, Defendant Barr Laboratories, Inc. ("Barr") is in the process of developing a generic form of TAMBOCOR™, and has filed the appropriate applications with the Food and Drug Administration ("FDA"). In response to Barr's filings, 3M has brought suit against Barr, claiming infringement of the '384 and '873 patents. Barr has asserted counterclaims against 3M, requesting declaratory relief, and asserting claims of patent misuse and delisting. Currently before the Court is Barr's motion for summary judgment for noninfringement, 3M's motion for voluntary dismissal pursuant to Fed. R. Civ. Proc. 41(a)(2) and to dismiss Barr's counterclaims pursuant to Fed. R. Civ. Proc. 12(b)(1).

1. Regulatory Process for Filing New Drug Applications and Abbreviated New Drug Applications.

Before 3M could market TAMBOCOR™, the Hatch-Waxman Act (the "Act") required 3M to obtain approval of the FDA through the New Drug Application ("NDA") process. 21 U.S.C. § § 355(a) and (b). As part of the NDA process, 3M had to identify patents that claim the drug that is the subject of the application or which claim a method of using such drug "and with respect to

which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use or sale of the drug." 21 U.S.C. § 355(b)(1). Once a drug is approved, the patent information filed by the NDA applicant is published in the Approved Drug Products With Therapeutic Equivalence Evaluations, commonly referred to as the Orange Book. TAMBOCOR™ was approved by the FDA, and 3M identified the '384 patent in its NDA application for publication in the Orange Book.

Prior to the Act, the manufacture, use or sale of a patented invention during the term of a patent constituted infringement, even if it was for the purpose of conducting tests and developing information necessary to apply for regulatory approval. Abbot Laboratories v. Zenith Laboratories, Inc., 934 F. Supp. 925, 930 (N.D. Ill. 1995). The result was those planning on competing with the patentee could not commence testing or develop information until after the expiration of the patent term, thus the patentee's de facto monopoly would be extended sometimes for a substantial period beyond the patent term. Id. at 931.

To address this situation, Congress enacted legislation that allows a generic manufacturer to piggyback a pioneer drug's NDA by submitting an Abbreviated New Drug Application ("ANDA"). 21 U.S.C. § 355(j). The Act modified the patent laws to provide that such manufacture, use or sale of a patented invention, solely for purposes of development and submission of information under federal law, was not an act of infringement. 35 U.S.C. § 271(e)(1). An ANDA can be filed if the generic drug manufacturer's active ingredient is, for example, the "bioequivalent" of the listed drug. 21 U.S.C. § 355(j)(2)(A)(iv). When submitting

an ANDA, the generic manufacturer must also certify one of four statements concerning the listed drug – the pertinent certification for this case being a paragraph IV certification – that the listed drug is invalid or it will not be infringed by the manufacture, use or sale of the new drug covered by the ANDA. § 355(j)(2)(A)(vii)(IV). While the development of a generic drug is authorized by the Act, the filing of a paragraph IV certification acts as a technical act of infringement, allowing the patent holder to bring suit to protect its interests. Bayer AG v. Elan Pharmaceutical Research Corporation, 212 F.3d 1241, 1245 (Fed. Cir. 2000)(citing 35 U.S.C. § 271(3)(2)(A)).

If the ANDA is certified under paragraph IV, the applicant must notify the patent holder. 21 U.S.C. § 355(j)(2)(B)(ii). In the notice, the ANDA applicant must include information that an application has been submitted, and must also include a "detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed." Id.

An ANDA approved under paragraph IV may be approved immediately after meeting all applicable scientific and regulatory requirements unless the listed drug's patent owner brings suit for infringement within 45 days or receiving notice. Id. at § 355(j)(5)(B)(iii). If suit is brought, the FDA is required to suspend approval of the ANDA, and the FDA cannot approve the ANDA until the earliest of three dates: 1) the date the court's decision that the listed drug's patent is either invalid or not infringed; 2) the dated the listed drug's patent expires; or 3) subject to modification by the court, 30 months from the date the owner of the listed drug's patent received the IV certification notice. Id.

The Act also provides an incentive for the first ANDA filer. The first to file an ANDA provides that entity with a 180-day marketing exclusivity period during which time no subsequent ANDA's can be approved by the FDA. 21 U.S.C. § 355(j)(5)(iv). A court decision of invalidity or noninfringement triggers the exclusivity period – even if the finding of noninfringement occurs in an unrelated case. Teva Phgarms. USA v. United States Food & Drug Administration, 182 F.3d 1003 (D.C.Cir. 1999).

In this case, Alphapharm Pty Ltd. ("Alphapharm") was the first to file an ANDA with respect to 3M's NDA for TAMBOCOR™. Pursuant to the Act, Alphapharm filed a paragraph IV certification that the '384 patent was not infringed, and sent the required notice to 3M. 3M brought suit against Alphapharm, claiming infringement of its patents. That suit is pending before this Court as well.

Barr filed a subsequent ANDA with a paragraph IV certification in July 2000, stating the '384 patent is not infringed. In relevant part, Barr's notice to 3M stated:

> With respect to claim 1 of the '384 patent, this claim is directed to the compound 2,5-bis(2',2',2'-trifluoroethoxy)acetophenone. The active ingredient in the proposed drug product is 2,5-bis(2',2',2'-trifluoroethoxy)-N-(2-piperidylmethl)-benzamide. The active ingredient is therefore not the same as the compound claimed in claim 1 of the '384 patent. Moreover, because the active ingredient was known before the earliest effective filing date of the '384 patent, the active ingredient cannot infringe claim 1 of the '384 patent under the doctrine of equivalents.
>
> With respect to claim 2 of the '384 patent, this claim is directed to the compound 2,5-bis(2',2',2'-trifluoroethoxy)alpha, alpha-dichloroacetophenone. The active ingredient in the proposed drug product is therefore not the same as the compound claimed in claim 2 of

> the '384 patent. Moreover, because the active ingredient was known before the earliest effective filing date of the '384 patent, the active ingredient cannot infringe claim 2 of the '384 patent under the doctrine of equivalents.
>
> With respect to claim 3 of the '384 patent, this claim is directed to the compound 2,5-bis(2',2',2'-trifluoroethoxy)alpha, alpha, alpha-trichloroacetophenone. The active ingredient in the proposed drug product is therefore not the same as the compound claimed in claim 3 of the '384 patent. Moreover, because the active ingredient was known before the earliest effective filing date of the '384 patent, the active ingredient cannot infringe claim 3 of the '384 patent under the doctrine of equivalents.
>
> Amended Declaration of Christine Siwik, Ex. 6.

Upon receiving Barr's notice, 3M asked Barr to provide more information, on a confidential basis, to assist 3M in confirming that Barr had not and would not infringe 3M's patents. Id., Ex. 7. Specifically, 3M sought further information into "whether any of the claims compounds or their equivalents are likely to be present in Barr's proposed final drug product." Id. 3M elaborated on the type of information it sought.

> Those claimed compounds or their equivalents may be present in Barr's final product if, for example, the flecainide acetate raw material is manufactured by the process disclosed in the '384 patent or an equivalent process. Accordingly, please provide us on an "Attorney's Eyes Only" basis with documents describing the synthetic pathway used to manufacture the flecainide acetate raw material used in Barr's proposed product. In addition, please provide us, again on an "Attorney's Eyes Only" basis, with documents that indicate the country where Barr's flecainide acetate raw material will ultimately be manufactured and the name of the entity that will manufacture it.

Id. In a responsive letter, Barr refused to provide 3M this information, asserting that such information was not required or necessary for 3M to confirm that Barr's product did not infringe the '384 patent. Id. Ex. 8. Barr further asserted that

"Barr's proposed product does not contain any of the compounds claimed in the '384 patent and, in fact, Barr's active ingredient was known well over a year before [3M] filed its earliest relevant patent application." Id.

By letter dated August 25, 2000, 3M notified Barr that it had filed suit against Barr, accusing Barr of infringing '384 and the '873 patents. Id., Ex. 9. It further stated, "3M believes that the only commercially viable process for making flecainide acetate is the process disclosed and claimed in its patents, which involves the intermediates also disclosed and claimed in its patents." Id.

3M asserts that despite Barr's earlier reluctance to provide it information, Barr *sua sponte* turned over the requested documents soon after the pleadings in this case were filed. These documents disclose who is manufacturing flecainide acetate for Barr, an Italian corporation called A.M.S.A., and the process used to make the flecainide acetate. Specifically, the process utilized by A.M.S.A. is covered by patents, owned by 3M, that have expired, United States Patent No. 3,900,481 (the '481 patent) and United States Patent No. 3,766,247 (the '247 patent). Because both the '481 and the '247 patents have expired, the public is free to use the methods disclosed in those patents.

Barr moves the Court for summary judgment as to infringement, arguing that there are no genuine issues of material fact, and that it is entitled to judgment as a matter of law. 3M concedes that flecainide acetate manufactured pursuant to methods disclosed in the '481 and '247 patents would not result in infringement of the '384 and '873 patents. In fact, 3M asserts that had Barr disclosed this information prior to suit, it would not have filed this action. 3M argues that Barr

withheld this information to force 3M to file suit, in order to obtain a judgment of noninfringement. Barr seeks such a judgment, because its effect would be to prematurely trigger Alphapharm's exclusivity period under the Act, conceivably allowing Barr to enter the market faster. 3M now asks the Court to dismiss its Complaint without prejudice, pursuant to Fed. R. Civ. P. 41(a)(2), and to dismiss Barr's counterclaims pursuant to Rule 12(b)(1), to put the parties in the position they would have been in had 3M not initiated this action. It is for this reason that 3M opposes judgment on the issue of infringement, and asks the Court to deny Barr's motion for summary judgment.

Alphapharm has intervened in this action, and also moves the Court to dismiss 3M's Complaint without prejudice, and opposes Barr's motion for summary judgment for noninfringement.

2. Voluntary Dismissal Pursuant to Rule 41(a)(2).

Rule 41(a)(2) of the Federal Rules of Civil Procedure provides that once an answer or motion for summary judgment has been filed, "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." The decision to allow a party to voluntarily dismiss an action rests within the sound discretion of the court. Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 187 F.3d 941, 950 (8th Cir. 1999). The factors that the court should consider in exercising this discretion are: 1) whether the party has presented a proper explanation for its desire to dismiss; 2) whether a dismissal would result in a waste of judicial time and effort; and 3) whether a dismissal will prejudice the defendant. Id. (citations omitted).

"Likewise, a party is not permitted to dismiss merely to escape an adverse decision nor to seek a more favorable forum." Id.

As noted above, 3M seeks dismissal of its Complaint without prejudice. It specifically asks the Court to fashion the order so that the parties are in the same position they would have been in had 3M not filed suit. 3M's justification for its request to dismiss without prejudice under Rule 41 is to prevent a judgment from being entered that would prematurely trigger Alphapharm's exclusivity period. 3M argues it is entitled to such relief, as Barr "hoodwinked" it into filing suit in the first place and that Barr should not benefit from such unfair conduct.

First, the Court finds no merit to 3M's assertion that Barr somehow "hoodwinked" it into filing suit. Pursuant to the ANDA application process, Barr was required to notify 3M of its application and its paragraph IV certification and to include in such notification a "detailed statement of the factual and legal basis" of Barr's opinion regarding noninfringement. In its notice, Barr explained that its product did not infringe the '384 patent as its active ingredient was different from the intermediate compounds claimed in the '384 patent. However, the '384 patent claims intermediate compounds that are used to manufacture flecainide acetate, the active ingredient used in Barr's proposed product. If the flecainide acetate used in Barr's proposed product was manufactured pursuant to the method claimed in the '873 patent, the intermediate compounds claimed in the '384 would be present in Barr's proposed final product. See, Amended Siwik Decl. Ex. 7. Thus, one way to determine if the '384 would be infringed would be to ascertain how Barr's flecainide acetate was to be manufactured.

However, another way to determine whether the '384 claimed compounds were present in Barr's proposed final product would be through Barr's assurances to that effect. In its responsive letter, Barr did assure 3M that its final product did not contain any of the compounds claimed in the '384 patent. Siwik Decl., Ex. 7. Although 3M may have wanted assurance through the identification of the manufacturer and the method used by such manufacturer to produce flecainide acetate, the Court agrees that 3M cannot seek assurance through confidential or proprietary information. Further, 3M's decision to sue Barr for infringement was also based on its opinion that the '873 and '384 methods were the only commercially viable methods for producing flecainide acetate. Id. Ex. 9. However, as shown by Barr, other methods for producing flecainide acetate did exist and 3M was aware of such methods as they were claimed in patents owned by 3M. The Court thus finds that Barr's assurances, together with 3M's knowledge that other methods did exist for producing flecainide acetate, were sufficient to satisfy the notice requirements of the ANDA process.

The Court is also not convinced that a judgment of noninfringement in this case would "prematurely" trigger Alphapharm's exclusivity period. As noted by the Supreme Court, the purpose of the Act was to get generic drugs on the market more quickly:

> As an additional means of eliminating the *de facto* extension at the end of the patent term in the case of drugs, and to enable new drugs to be marketed more cheaply and quickly, § 101 of the 1984 Act amended § 505 of the FDCA, 21 U.S.C. § 355, to authorize abbreviated new drug applications (ANDA's), which would substantially shorten the time and effort needed to obtain marketing approval.

Eli Lilly v. Medtronic, Inc., 496 U.S. 661, 676 (1989). While the Act also provides incentives to first ANDA filers by granting them an exclusive marketing period, it would be contrary to the very purpose of the Act to allow the first filer to block market entry of other generic manufacturers because the first filer is involved in protracted litigation. The idea that subsequent ANDA filers could trigger the exclusivity period was squarely recognized in Teva, supra.

In Teva, a subsequent ANDA filer had filed a declaratory judgment action against the patent holder in order to obtain a court decision that would start the first ANDA filer's exclusive marketing period. Id. 182 F.3d at 1004. That case was subsequently dismissed by the district court for lack of subject matter jurisdiction, based on the patent holder's admission of non-infringement and its express assurance that it would not bring suit against Teva in the future. Id. at 1006. After the FDA refused to treat the dismissal of Teva's suit as a judgment on the merits that would trigger the market exclusivity period, Teva sought injunctive relief against the FDA. Id. at 1005. The court ultimately determined that the dismissal for lack of subject matter jurisdiction could meet the requirements of a court decision under § 355(j)(5)(B)(iv)(II), because it was based on the underlying finding that the patent holder had made express assurances that it would not bring suit against Teva for infringement. Id. at 1009. Teva thus supports the position that a subsequent ANDA filer can participate in litigation in order to trigger the exclusive marketing period granted the first filer.[1]

---

[1] Although the Teva case did not involve allegations of "hoodwinking", the Court notes that Teva filed a declaratory judgment action for the sole purpose of obtaining a triggering

In the end, 3M is seeking to escape an adverse judgment, ostensibly for the benefit of Alphapharm. Regardless of the beneficiary, 3M is not entitled to a voluntary dismissal simply to escape an adverse judgment. Hamm at 950.

Accordingly, 3M's motion for voluntary dismissal pursuant to Rule 41(a)(2) must be denied.

3. Barr's Motion for Summary Judgment for Non-Infringement

Barr moves the Court for summary judgment that its proposed drug product does not infringe the '384 and '873 patents. 3M did not respond to Barr's motion by addressing the merits of the infringement analysis. Rather, 3M moved for a continuance pursuant to Rule 56(f). At oral argument, however, 3M notified the Court that it would withdraw that motion as it had obtained the information it sought.

As 3M has not objected to Barr's motion as to the merits, Barr's motion for summary judgment will be granted, as the Court is satisfied that Barr's product does not infringe the '384 and '873 patents.

---

judgment. Barr has represented to the Court that had 3M not filed suit, it would have also filed a declaratory judgment action, and thus there was no need to "hoodwink" 3M. Furthermore, the Court notes that the district court in Teva dismissed the action for lack of subject matter jurisdiction, based on the patent holder's representation that it would not bring suit. Teva, at 182 F.3d at 1006. The case currently before the Court presents similar circumstances. Barr has filed a counterclaim alleging *inter alia* noninfringement. During oral argument, 3M assured the Court and Barr that it would not bring suit against Barr for infringement of the '384 patent. Based on these circumstances, Barr would nonetheless be entitled to a triggering "judgment" if Barr's counterclaim is dismissed for lack of subject matter jurisdiction.

The Court also recognizes that at the time of oral argument, Barr had not yet received approval from the FDA. It is 3M and Alphapharm's position that as Barr has not yet received approval, and may not receive such approval in the near future, it cannot argue that its ability to market flecainide acetate in a generic form is hindered by any conduct of 3M or Alphapharm. However, no evidence was presented to the Court to show that Barr would not receive such approval in the near future.

Alphapharm also moved the Court for a continuance pursuant to Rule 56(f), seeking information as to the status of Barr's approval from the FDA and whether AMSA has been inspected and determined to be acceptable by the FDA. Alphapharm argues that such information is material to Barr's motion for summary judgment, as such information goes to Barr's motivation behind this lawsuit. The Court disagrees that the information sought is material to Barr's motion for summary judgment, for it has no bearing on whether Barr will infringe the '384 patent. Accordingly, Alphapharm's motion for a continuance must be denied.

4. 3M's Motion to Dismiss Barr's Counterclaims

During oral argument, Barr represented to the Court and to 3M that it would dismiss its counterclaims in the event the Court were to grant its motion for summary judgment as to noninfringement. Accordingly, the Court will dismiss such claims.

IT IS HEREBY ORDERED that:

1. Barr's Motion for Summary Judgment is GRANTED.
2. Alphapharm's Motion for a Continuance Pursuant to Rule 56(f) is DENIED.

3. 3M and Alphapharm's Motion to Dismiss 3M's Complaint pursuant to Rule 41(a)(2) is DENIED.

4. 3M's Motion to Dismiss Barr's Counterclaims is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Date: 4-17-01

Michael J. Davis
United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd